**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

| | | |
|---|---|---|
| **AHADAMS & COMPANY, P.C.,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| **v.** | : | **NO. 12-4835** |
| | : | |
| **SPECTRUM HEALTH SERVICES, INC., et al.,** | : | |
| **Defendants.** | : | |

_____:

**<u>MEMORANDUM</u>**

PRATTER, J.                                                                AUGUST 14, 2014

## I.     INTRODUCTION

In this case of alleged copyright infringement, the Defendants, moving for summary judgment, have asked the Court to determine that as a matter of law, Defendant Spectrum Health Services, Inc. ("Spectrum"), had an implied license to use, for its construction the New Haddington Health Center, the architectural work and technical drawings (the "Drawings") that Plaintiff AHAdams & Company, P.C. ("AHAdams"), created for Spectrum before the two parties parted ways. Claiming copyright infringement (Count I), AHAdams, in addition to suing Spectrum, the owner of the New Haddington Health Center project, has also named Paul E. Jones and Paul E. Jones Associates, Inc. (with Spectrum, collectively, the "Spectrum Health Defendants"), and T.N. Ward Company, Charles Matsinger, and Charles Matsinger Associates, Inc. (collectively, the "Matsinger Defendants"). AHAdams also asserts supplemental state law claims for breach of contract (Count II) and unjust enrichment (Count III) against Spectrum.[1] As explained in detail hereafter, the Court will grant the motions for summary judgment.

_____

[1]     On July 30, 2012, AHAdams voluntarily dismissed its suit in the Philadelphia County Court of Common Pleas alleging breach of contract and unjust enrichment against Spectrum Health.

## II.    FACTUAL BACKGROUND[2]

In 2005 or 2006, Spectrum hired Arthur H. Adams and his architectural firm, AHAdams, to assist in the selection of a location for the construction of the New Haddington Health Center (the "HHC"). After Spectrum selected the location for the HHC, AHAdams performed various services for the development of the HHC. On June 1, 2009, AHAdams prepared and submitted a memorandum (the "Proposal"), that outlined the remaining phases of design and construction and the services that AHAdams proposed to perform with regard to each phase. The Proposal did not require the use of AHAdams's services through completion of the HHC project, nor did it impose any restrictions on Spectrum's use of any drawings or other work product prepared for Spectrum by AHAdams.

In addition to the Proposal, AHAdams, per Mr. Adams, also drafted, unilaterally signed, and submitted to Spectrum an iteration of the standard project agreement recommended by the American Institute of Architects ("AHAdams AIA Agreement").[3] Section 7.3 of the AHAdams AIA Agreement provided:

> Upon execution of this Agreement, the Architect [AHAdams] grants to the Owner [Spectrum] a nonexclusive license to use the Architect's Instruments of Service solely and exclusively for purposes of constructing, using, maintaining, altering and adding to the Project, provided that the Owner substantially performs its obligations, including prompt payment of all sums when due, under this Agreement. The Architect shall obtain similar nonexclusive licenses from the Architect's consultants consistent with this Agreement. The license granted under

---

[2]    The facts are undisputed unless expressly noted. Where there is a factual dispute, as long as the nonmoving party has record support for its position, the facts are viewed in the light most favorable to it.

[3]    AHAdams denies that the Defendants operated under the AHAdams AIA Agreement because Spectrum never signed the agreement. However, Mr. Adams testified during his deposition that he believed that both parties were operating pursuant to its terms. Spectrum's Mot. Summ. J., Ex. D, Dep. of Arthur Adams (May, 7, 2013) ("Adams 2013 Dep.") at 15:20-16:3.

> this section permits the Owner to authorize the Contractor, Subcontractors, Sub-subcontractors, and material or equipment suppliers, as well as the Owner's consultants and separate contractors, to reproduce applicable portions of the Instruments of Service solely and exclusively for use in performing services or construction for the Project. If the Architect rightfully terminates this Agreement for cause as provided in Section 9.4, the license granted in this Section 7.3 shall terminate.

Spectrum's Mot. Summ. J. ("MSJ," Docket No. 41), Ex. F. Thus, based upon the facts of the parties' conduct vis à vis each other and on the AHAdams AIA Agreement, Spectrum argues that it retained the license to use the Instruments of Service after the termination of the Agreement.

From June 2009 through the end of March 2010, AHAdams performed architectural and design services for the HHC project and submitted invoices, which were paid in full—a total of approximately $558,000. After March 2010, Spectrum refused to pay AHAdams's subsequent invoices out of concern with AHAdams's billing, and by April 2010, Spectrum had hired an outside consultant, Paul Jones, who recommended that Spectrum consider moving to a design-build delivery method for the project.[4] In May 2010, Mr. Adams and Mr. Jones discussed Spectrum Health's refusal to pay AHAdams. Mr. Adams testified that he wrote a memo to Spectrum Health on July 10, 2010, because he was unsure of his role in the future design and construction of the HHC.[5] Spectrum's Mot. Summ. J., Ex. G, Dep. of Mr. Adams (July 17, 2012) ("Adams 2012 Dep.") at 173:14-19, 174:10-17.

Also in July 2010, Mr. Jones requested that AHAdams provide six copies of the Drawings on CDs. Mr. Adams complied. On the July 29th transmittal cover sheet for the transmittal, Mr. Adams wrote:

---

[4]   A design build delivery method is when a single entity provides a combination of architectural and construction services. Spectrum's MSJ, Ex. O.

[5]   Although Mr. Adams disputes that he was aware of the possibility of Spectrum's moving towards a design-build method in July 2010, Pl.'s Resp. ¶ 55, he does not dispute that he sent the memo to clarify his role in the HHC project.

> Paul: Enclosed please find six (6) copies of the drawings and specifications for the New Haddington Health Center. . . . I would suggest that anyone looking at the documentation for pricing be made aware of the nature of the VE items and that the project will be going for LEED Certification.

Spectrum's Mot. Summ. J., Ex. E. The six CDs were addressed as follows: four to the contractors T.N. Ward, Domas, Intech and EP Guidi; one to Mr. Jones; and one to Spectrum. Although neither Spectrum nor AHAdams alleges that there was any further discussion about the transmission of the Drawings, AHAdams notes that each drawing contained the notice

> © AHAdams & Company 2008. This drawing or parts thereof may not be altered or reproduced in any form without the written permission of AHAdams & Company.

Pl.'s Resp. ¶ 68.

Following his delivery of the drawings, Mr. Adams kept in contact with Mr. Jones and Spectrum. In an August 11, 2010 email to Mr. Jones, Mr. Adams acknowledged his understanding that Spectrum had decided to use a design-build delivery model. Spectrum's MSJ, Ex. H. Mr. Jones's response email gave no assurances to Mr. Adams that he would be selected as the architect for this new model.[6] *Id.* Additionally, about one week later in an August 17, 2010 email to Mr. Jones, Mr. Adams stated:

> I am 'rounding up' all the drawings . . . getting final sets from everyone with the intent that they are essentially complete and ready for submission to the City of Philadelphia for a building permit. Of course the zoning permit and the PWD permit, and the streets department permit need to be issued but at this point they are appear to be close at hand (we are by our contract committed to services to provid[e] a permit set of drawings). What date would you like us to use for "Issued for Permit" on the drawings?

Spectrum's MSJ, Ex. P. The next day, on August 18, 2010, Mr. Jones notified Mr. Adams in writing that he (Mr. Jones) was "sending out a Request for Information and a Request for Proposal to the four prequalified contractors today." *Id.*

---

[6]      Specifically, Mr. Jones states in his email that he had some ideas "how we *might* continue to have your involvement through the design/build process." *Id.* (Emphasis added.)

On August 20, 2010, Spectrum officially terminated its relationship with AHAdams. On August 23, 2010, AHAdams responded with two conflicting letters: The first letter acknowledged the termination and stated that AHAdams is willing to work with Spectrum and Paul Jones "to provide information to allow the permitting process to continue" and further stated that AHAdams will "continue to allow Spectrum Health Services access to the documentation prepared as part of the design process and work with [Spectrum Health] or a designated representative . . . to find a mutually beneficial conclusion to our contractual relationship." Spectrum's MSJ, Ex. Q. The second letter notified Spectrum that AHAdams's drawings could not be used for competitive bidding purposes without AHAdams's permission and that AHAdam's "ha[d] not given permission that the drawings may be used for bidding." Compl., Ex. P. Thereafter, AHAdams formalized a fee dispute with litigation in the Philadelphia County Court of Common Pleas and then expanded the dispute by filing the instant lawsuit in this Court by adding a federal claim for copyright infringement.[7]

AHAdams claims here that in soliciting bids, Spectrum, per Mr. Jones, copied the Drawings in violation of AHAdams's copyright. AHAdams also contends that Spectrum's rendering of the building at its website is derivative of the Drawings, and, as such, violates Plaintiff's copyright. AHAdams alleges that T.N. Ward, the successful bidder, posted Plaintiff's copyrighted drawings on its website in connection with its successful bid. AHAdams also alleges that the Matsinger Defendants likewise copied and prepared derivatives of the Drawings.

Earlier in this litigation, the Spectrum Health Defendants filed a Joint Motion to Dismiss asserting that AHAdams's claim for copyright infringement failed as a matter of law because

---

[7]     The ongoing fee dispute does not prevent the Court from determining if AHAdams granted Defendants a nonexclusive license. *See Beholder Prods., Inc. v. Catona*, 629 F. Supp. 2d 490, 495 (E.D. Pa. 2009).

AHAdams had granted the Defendants an implied nonexclusive license to use the Drawings. The Court denied the Motion to Dismiss because the Court could not consider the documents on which the Defendants sought to rely because they were outside the pleadings. Instead, the Court ordered limited discovery on the issue of the alleged implied nonexclusive license.

Now before the Court are several motions for summary judgment filed by all of the Defendants (Docket Nos. 39-41). The Defendants again assert that AHAdams's copyright infringement claims fail as a matter of law because AHAdams granted them an implied nonexclusive license to use the Drawings. The Court agrees and, accordingly, will grant the motions for summary judgment and declines to exercise supplemental jurisdiction over AHAdams's state law claims.


## III.    LEGAL STANDARD

Upon motion of a party, summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party moving for summary judgment has the initial burden of supporting its motion by reference to admissible evidence showing the absence of a genuine dispute of a material fact or showing that there is insufficient admissible evidence to support the fact. *Id.* 56(c). Once this burden has been met, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006).

Summary judgment should be granted only if the moving party persuades the district court that "there exists no genuine issue of material fact that would permit a reasonable jury to

find for the nonmoving party." *Miller v. Ind. Hosp.*, 843 F.2d 139, 143 (3d Cir.1988). A fact is "material" if it could affect the outcome of the suit, given the applicable substantive law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence presented "is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a summary judgment motion, a court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor. *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005). The court must not weigh the evidence or make credibility determinations. *Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998). Nevertheless, the party opposing summary judgment must support each essential element of his or her opposition with concrete evidence in the record. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). Of course, the court may grant summary judgment if the plaintiff's version of the facts, as a matter of law, does not entitle her to relief: "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and internal quotation marks omitted).

## IV.   DISCUSSION

Defendants claim that summary judgment is appropriate because AHAdams's conduct granted them an implied nonexclusive license to use the drawings in the construction of the HCC, whether or not AHAdams was to remain involved in the project. AHAdams retorts that its

conduct did not grant an implied nonexclusive license, and, accordingly, that Defendants violated its copyright in the Drawings.

"To establish a claim of copyright infringement, a plaintiff must establish: (1) ownership of a valid copyright; and (2) unauthorized copying of original elements of the plaintiff's work." *Kay Berry, Inc. v. Taylor Gifts, Inc.*, 421 F.3d 199, 203 (3d Cir. 2005) (quoting *Dun & Bradstreet Software Servs., Inc. v. Grace Consulting, Inc.*, 307 F.3d 197, 206 (3d Cir. 2002)). The owner of the copyright has the exclusive right to copy, distribute, or display his or her work. *MacLean Assocs., Inc. v. Wm. M. Mercer–Meidinger–Hansen, Inc.*, 952 F.2d 769, 778 (3d Cir. 1991) (citing 17 U.S.C. § 106). "While an exclusive license transferring ownership of a copyright must be in writing, a nonexclusive license may be oral or implied because it does not amount to a 'transfer' of ownership."[8] *Beholder Prods., Inc. v. Catona*, 629 F. Supp. 2d 490, 493-94 (E.D. Pa. 2009) (citing 3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 10.03[A], at 10-37 (1991) (Lexis)).

Courts in this Circuit have utilized a three-factor test adopted by several other courts of appeals to determine whether or not an implied license has been granted. *See Nat'l Ass'n For Stock Car Auto Racing, Inc. v. Scharle*, 184 Fed. Appx. 270, 275 (3d Cir. 2006); *Beholder Prods.*, 629 F. Supp. 2d at 494. Under the test, a court may find an implied nonexclusive license if "(1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes that particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the license-requestor copy and distribute his work." *Asset Mktg. Sys., Inc. v. Gagnon*, 542

---

[8]    Most of AHAdams's opposition briefing focuses on the argument that a nonexclusive license was not given. However, at the conclusion of its briefing, AHAdams makes the completely unsupported assertion and argument that the Drawings are unique so that a license would be "de facto exclusive" and, thus, would be required to be in writing. AHAdams fails to support this contention by citing to any case law or relevant authority, and the Court will not take up the mantle of creative advocacy. Accordingly, the Court rejects this eleventh hour assertion.

F.3d 748, 754-55 (9th Cir. 2008) (footnote omitted) (quoting *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 776 (7th Cir. 1996)).

The intent factor is usually the focus of most courts' analysis. The intent benchmark is not a "subjective inquiry into the mind of the putative licensor." *John G. Danielson, Inc. v. Winchester-Conant Props., Inc.*, 322 F.3d 26, 42 (1st Cir. 2003) "Rather, it is an objective inquiry into facts that manifest such contractual intent." *Id.* And, in fact, the question of intent is the only issue here, because the first two factors are undisputed (Spectrum requested that the Drawings be created and AHAdams delivered the work accordingly).[9]

Although the Third Circuit Court of Appeals has not yet discussed implied nonexclusive licenses within the context of architectural drawings, several other courts of appeals have delineated factors a court should consider when analyzing the architect's objectively manifested intent. A nonexclusive list of factors includes

> (1) whether the parties were engaged in a short-term discrete transaction as opposed to an ongoing relationship; (2) whether the creator utilized written contracts, such as the standard AIA contract, providing that copyrighted materials could only be used with the creator's future involvement or express permission; and (3) whether the creator's conduct during the creation or delivery of the copyrighted material indicated that use of the material without the creator's involvement or consent was permissible.

*John G. Danielson, Inc.*, 322 F.3d at 41 (citing *Nelson-Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 516 (4th Cir. 2002)). The Court finds these factors useful in analyzing the dynamics of the parties' relationships and intentions here.

---

[9] Although Spectrum first contends that AHAdams granted it an "express" non-exclusive license for the Drawings based on the language in Section 7.3 of the AHAdams AIA Agreement, because the AHAdams AIA Agreement was never signed, and, thus, is not a binding contract, there is no basis to find an "express" nonexclusive license. Nevertheless, the AHAdams AIA Agreement is strong *evidence* of an implied nonexclusive license, as explained below.

As to the first factor, AHAdams had been working on the HHC project for years, and, thus, their involvement cannot be seen as being discrete or short term. Thus, the relationship factor would not itself support the assertion that AHAdams granted Spectrum a nonexclusive license.

The second factor, however, does favor finding an implied nonexclusive license. AHAdams did not utilize written contracts to protect its interest in the Drawings. In fact, as detailed previously, the AHAdams AIA Agreement would have provided just the opposite. While the parties have not pointed to any relevant executed contracts, AHAdams's Proposal and the AHAdams AIA Agreement are strong evidence of AHAdams's intent, at the time of the parties' working relationship, to grant a nonexclusive license. *See Nelson-Salabes*, 284 F.3d at 516 (unexecuted contracts are still indicative of architect's intent); *Johnson v. Jones*, 149 F.3d 494, 500 (6th Cir. 1998) (same). The Proposal does not purport to limit Spectrum's use of any drawings or other work product prepared by AHAdams, and, thus, the Proposal itself is objective evidence that points in favor of AHAdams's intent to grant a nonexclusive license. *Cf. id.* ("NSI never expressed to Strutt by its representations or conduct that Strutt could utilize NSI's plans without NSI's future involvement or express consent; in fact, NSI specifically advised Strutt to the contrary on at least two occasions."). The AHAdams AIA Agreement, which AHAdams prepared and signed unilaterally, is powerful objective evidence establishing that AHAdams intended to grant a nonexclusive license. Specifically, Section 7.3 of the AHAdams AIA Agreement  "grant[ed] to the Owner [Spectrum] a nonexclusive license to use the Architect's [AHAdams] Instruments of Service solely and exclusively for purposes of constructing, using, maintaining, altering and adding to the Project." Spectrum's MSJ, Ex. F. The Agreement further "permit[ted] the Owner to authorize the Contractor, Subcontractors, Sub-subcontractors, and

material or equipment suppliers, as well as the Owner's consultants and separate contractors, to reproduce applicable portions of the Instruments of Service solely and exclusively for use in performing services or construction for the Project." *Id.*[10]

The facts of this case are similar to those in *Foad Consulting Group, Inc. v. Musil Govan Azzalino,* 270 F.3d 821 (9th Cir. 2001) where the Ninth Circuit Court of Appeals affirmed the district court's grant of summary judgment on a copyright infringement claim because of an implied license. In *Foad*, the contractual language contained an indemnification clause to protect the plaintiff, an engineering firm, from liability if another entity later used the plans. The Court determined that the indemnification clause, in addition to the absence of any language prohibiting the developer from using the plan, was strong evidence establishing intent to grant a nonexclusive license. In this case, the language of the AHAdams AIA Agreement is stronger evidence still of an intent to grant a nonexclusive license. The AHAdams AIA Agreement explicitly states that AHAdams grants a nonexclusive license to use the Drawings for the construction of the HHC. Moreover, as in *Foad*, there is no language in the Proposal or the AIA Agreement that prohibits the use of the Drawings. In fact, the contractual language used in the

---

[10]   AHAdams asserts that the Court should not consider the AHAdams AIA Agreement because Spectrum did not sign it or follow its requirements. Although the Court agrees that enforcing the AHAdams AIA Agreement as a contract would be unwarranted, under the governing legal standard, as set out above, the proposed contractual language, under which it is undisputed that AHAdams itself was operating, is highly relevant to the Court's consideration of whether AHAdams manifested objective intent to grant Spectrum a nonexclusive license to use the Drawings for the project. Indeed the contractual language is not in dispute, nor is the fact that Mr. Adams signed the AIA Agreement and believed that he was operating according to the AIA Agreement.

AHAdams also asserts that only Mr. Adams's interpretation of the AIA Agreement is relevant, and, because at his deposition Mr. Adams stated that Section 7.3 did not grant Spectrum Health a nonexclusive license, the unambiguous language granting a nonexclusive license is immaterial. But, again, when determining whether a nonexclusive license was granted, courts look to *objective* evidence. Because the AHAdams AIA Agreement unambiguously grants a nonexclusive license to Spectrum to use the Drawings, Mr. Adams's post-hoc subjective interpretation is not relevant to the Court's analysis.

AIA Agreement is almost opposite of that used in cases where court have concluded that a nonexclusive license was not granted. *See Danielson*, 322 F.3d at 41 (architect signed contract providing that the plans "shall not be used . . . for other projects, for additions to this Project, or for completion of this Project by others . . . except by agreement in writing and with appropriate compensation"); and *Nelson-Salabes*, 284 F.3d at 516 (architectural firm submitted contracts that contained language prohibiting use of its drawings without the plaintiff's future involvement or consent).) Accordingly, the objective facts here regarding the second factor strongly support Defendants' assertion that they were granted a nonexclusive license.

When evaluating the third factor regarding the creator's intent, courts "look to whether the supposed infringer obtained the plans directly from the supposed licensor, which would suggest permission to use them." *John G. Danielson*, 322 F.3d at 42. In this case, on July 29, 2010, Mr. Adams sent six CDs directly to Mr. Jones, Spectrum's agent. As noted earlier, the six CDs were all addressed to the various Defendants, knowing that they would be used for pricing the construction of the HHC. Spectrum's Mot. Summ. J., Ex. E. Additionally, at the time of the delivery of the CDs, Spectrum was under no obligation to continue to use AHAdams's services and, as he stated in his deposition, Mr. Adams himself was unsure of his future role in the HHC project. Accordingly, Mr. Adams's conduct surrounding the delivery of the Drawings at issue is objective evidence supporting the conclusion that AHAdams granted Spectrum a nonexclusive license.[11]

---

[11]   The Court does not agree with Plaintiff's assertion that Mr. Adams's creation of six copies of the CD is dispositive evidence that he did not want the Drawings to be copied. That inference is not objectively reasonable. Nothing in the transmittal cover sheet suggests such an interpretation. Moreover, the reasonable inference from the inclusion of six copies is that Mr. Adams, who had to make a CD anyway and knew that multiple parties would need copies, took the helpful step of expending the process by copying the CD so that its client Spectrum (which had already paid AHAdams more than a half of a million dollars) would not have to.

AHAdams focuses on the fact that the drawings stated "© AHAdams &Company 2008. This drawing or parts thereof may not be altered or reproduced in any form without the written permission of AHAdams&Company." Pl.'s Resp. ¶ 68. AHAdams asserts that this language is conclusive evidence that it did not grant a nonexclusive license. But including a copyright symbol on delivered drawing does not establish that a party does not intend to grant a nonexclusive license. *See Asset Mktg. Sys., Inc.*, 542 F.3d at 757 ("[T]he splash screens containing the copyright notice do not negate AMS's license to use the product. The splash screens speak to Gagnon's intent to retain copyright ownership over the programs, not to his intent to grant or not grant a license as would be his right as the copyright owner." *Asset Mktg. Sys., Inc. v. Gagnon*, 542 F.3d 748, 757 (9th Cir. 2008). Upon review of the Drawings here, the Court concludes that the additional language following the copyright symbol does not take this case out of the reach of that general rule.

While AHAdams asserts that the language establishes its intent to prohibit use of Drawings, the undisputed facts in this case, as well as appearance of the language on the drawings, undermine this contention. First, the language following the copyright symbol is the *only* indication of record that, during the many months the parties worked together and Spectrum paid AHAdams over half a million dollars, AHAdams "plainly contemplated [its] [required] long-term involvement in" the project. *Nelson-Salabes*, 284 F.3d at 516; *see id.* ("NSI specifically advised Strutt [that it could not] utilize NSI's plans without NSI's future involvement or express consent."). Second, although the Drawings are poster-size (two feet by three feet), the copyright language itself is miniscule—certainly no larger than font point size six[12]—and, moreover, is rather blurry and hard to read. This language cannot overcome the parties' prior dealings and the language in the AHAdams AIA Agreement that explicitly stated

---

[12]    In contrast, the font point size used for this Opinion is twelve.

that AHAdams was granting Defendants a nonexclusive license to use the Drawings. In sum, the Court concludes that, under the objective standard, including a tiny sentence on the drawings after the far more prominent explicit tender of a nonexclusive license does not create a question of material fact for a jury.

Moreover, Spectrum Health paid AHAdams over $500,000 for its services, including almost $100,000 for the architectural drawings. *See* Spectrum's Undisputed Facts ¶42. If the Court agreed with AHAdams's assertion that it did not grant an implied nonexclusive license, then the illogical result would be that Spectrum Health would have paid a large amount of money for Drawings it could use only upon compulsion to continue doing business with AHAdams. As the Ninth Circuit explained in *Foad*, finding that a nonexclusive license had not been granted "would allow architectural or engineering firms to hold entire projects hostage, forcing the owner either to pay the firm off, continue to employ it, or forego the value of all work completed so far and start from scratch." *Foad*, 270 F.3d at 829 n.12. In this case, AHAdams was paid a significant amount of money, and although AHAdams was aware that its Drawings were being copied prior to its official termination, it was not until after the parties engaged in a fee dispute that AHAdams mailed the letter claiming a copyright violation. *See* Adams 2013 Dep. at 36:9-37:9.

For the foregoing reasons, the Court concludes, as a matter of law under which there is no disputed issue of material fact, that AHAdams granted Defendants an implied nonexclusive license to use the Drawings in their construction of the HHC. There is no question that the Defendants' use of the Drawings fell within the scope of this implied nonexclusive license.

Accordingly, the Court finds that the Defendants are entitled to summary judgment on AHAdams's copyright infringement claim.[13]

## V.     CONCLUSION

Because AHAdams's federal claim will be dismissed, the Court will decline to exercise supplemental jurisdiction over the remaining state law claims. *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a [pendant state law claim] if . . . the district court has dismissed all claims over which it has original jurisdiction[.]"); *Borough of W. Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995) ("[W]here the claim over which the district court has original jurisdiction is dismissed before trial, the district court *must decline* to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." (emphasis added)).

---

[13] Finally, when the issue is the scope of the nonexclusive license and not its existence, the copyright owner has the burden of proving that the defendant's use was unauthorized. *Graham v. James*, 144 F.3d 229, 236 (2d Cir. 1998.) In this case, AHAdams makes an unsubstantiated claim that it did not grant Defendants a license to make derivatives of the Drawings. AHAdams has not met its burden of proving that making derivatives was unauthorized, and, moreover, upon reviewing the AIA Agreement, the language allows the Defendants to use the Drawings for the construction of the HHC. And AHAdams has not alleged in its Complaint or briefing that the Defendants used the drawings for anything other than the HHC's construction.

Additionally, no evidence has been presented that distinguishes the rights of the other Defendants to use the Drawings from the rights of Spectrum Health. Specifically, Paul E. Jones and his company Paul E. Jones, Associates, Inc., was at all times working as an agent of Spectrum and acting in its capacity as an agent. Additionally, T.N. Ward and the Matsinger Defendants are contractors and, thus, the language of the AHAdams AIA Agreement detailing the nonexclusive license applies to them as well because the AIA Agreement allows "Contractor, Subcontractors, . . .  Owner's consultants and separate contractors" to reproduce the Drawings in order to construct the HHC. Accordingly, the Court concludes that the implied nonexclusive license prevents AHAdams from asserting a copyright claim against all of the Defendants.

Thus, for the foregoing reasons, the Court will grant the Spectrum Health Defendants' Motion for Partial Summary Judgment, the Matsinger Defendants' Motion for Summary Judgment, and T.N. Ward's Motion for Summary Judgment.

An appropriate Order follows.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge